UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KELLI MOORE, CHARLES MOORE, J. S. M., J. L. M.,[1] | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| | ) No. 1:23-cv-00089-JPH-MG |
| CHARLA DAVIS, REECIA BELLAMY,[2] LEIGH ANNE MOORE, DAVID BALMER, | ) ) ) ) ) |
| Defendants. | ) ) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Kelli and Charles Moore allege that Indiana Department of Child Services ("DCS") caseworkers violated their Fourteenth Amendment substantive due process rights to familial integrity by conducting a wellness check at the Moores' home of two minors who the Moores had recently adopted. The remaining Defendants have moved for summary judgment. Dkt. [85]. For the reasons that follow, the Court **GRANTS** that motion.

---

[1] The parties use "J.D.M." instead of "J.L.M." For consistency, the Court does the same.

[2] The **clerk is directed** to update the docket to reflect that Ms. Bellamy's first name is spelled "Reecia." *See* dkt. 86 at 6.

# I.
## Facts and Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

### A. The Moores' foster period

Plaintiffs Kelli Moore and Charles Moore, a married couple, began fostering J.S.M. and J.D.M. in June 2020.  Dkt. 82-1 at 18; dkt. 83-1.  On September 23, 2020, J.S.M. and J.D.M. were adjudicated by a judge in a Marion County court to be in need of services.  *Ind. Dep't of Child Servs. v. C.M.*, 202 N.E.3d 446 (Ind. Ct. App. 2022) (unpublished table decision).

Between February and April 2021, DCS received four allegations of child abuse and neglect against the Moores as to J.S.M., J.D.M., and the Moores' biological children.  Dkt. 83-2.  DCS investigated and concluded that these reports were unsubstantiated.  Dkts. 83-5; 83-6; 83-7; 83-8; 83-9.

Defendant Charla Davis, the ongoing permanency Family Case Manager ("FCM") assigned to J.S.M. and J.D.M.'s child in need of services ("CHINS") case pending in Marion County, remained concerned that the children suffered abuse and neglect in the Moores' home.  Dkt. 82-5 at 9, 34–37, 164.  She found the children's multiple reports of abuse and neglect credible because the children made those reports numerous times to her and their reports were consistent in her separate meetings with them.  *Id.*

2

In April 2021, the Marion County CHINS court granted a motion to modify the children's foster placement. Dkt. 83-3. From that time until December 2021, J.S.M. and J.D.M. remained in a foster placement outside the Moores' home. *C.M.*, 202 N.E.3d at 446. In November 2021, the Moores filed petitions in Hamilton Superior Court to adopt the children. *Id.*

### B. The Moores' adoption petition is granted and J.S.M. and J.D.M. are transferred to their custody

The Hamilton County adoption court granted the Moores' petition to adopt J.S.M. and J.D.M. on December 2, 2021. *Id.* The Moores received notice of the adoption decree at about 8:30 a.m. the next morning, on December 3, 2021. *Id.* By 10:00 a.m. that morning, the Moores had taken custody of the children. *Id.*; *see also* dkt. 82-1 at 70.

At about 3:30 p.m. that day, FCM Davis, Guardian Ad Litem ("GAL") Monique Miller, and a Henry County sheriff's deputy arrived at the Moores' home. *C.M.*, 202 N.E.3d at 446. FCM Davis had learned that morning that J.D.M. had a strong negative reaction to learning about the adoption and had to be placed in the car while kicking and screaming about it. Dkt. 82-5 at 119–20. She had also learned that the children were sick, and she wanted to ensure that the Moores knew about their illness and that J.D.M. had her prescribed medicine. *Id.* at 118–19, 124–25. FCM Davis did not observe these events firsthand. Dkt. 90-1 at 68–70. Upon learning this information, Defendant Reecia Bellamy, an FCM Supervisor, instructed FCM Davis to go to the Moores' home to check on the children. Dkt. 82-3 at 58. The Marion

3

County CHINS case remained open at this time, and FCM Davis believed that she was still responsible for the children's wellbeing.  Dkt. 82-5 at 124–25; *see also* dkt. 82-1 at 73, 77.

When FCM Davis arrived with GAL Miller and the sheriff's deputy, Mr. Moore told them to get off the Moores' property.  Dkt. 90-3 at 13.  FCM Davis told the Moores that "they were going to take the kids back from" the Moores if the Moores did not allow a welfare check on the children[3] because "they were still the State of Indiana's kids."  Dkt. 90-4 at 9–11.  The sheriff's deputy told the Moores that they "had to let them in" because FCM Davis and GAL Miller had "a removal letter, they're wanting to remove the kids."  Dkt. 90-4 at 9; dkt. 90-3 at 8–9.  That removal letter, however, discussed the removal of the children from their biological parents, not the Moores.  Dkt. 90-3 at 8–9.  FCM Davis did not tell the Moores that the removal letter did not authorize DCS or the sheriff's deputy to take J.S.M. and J.D.M.  Dkt. 90-1 at 91–93.

After this initial interaction, the Moores called their attorney.  Dkt. 82-5 at 138.  The Moores' attorney then spoke on the phone with DCS's attorney. *Id.*  After the attorneys conferred, FCM Davis and GAL Miller conducted the wellness check.  *Id.*  The Moores allowed the wellness check only "under the threat of the kids being removed from [their] house and arrest."  Dkt. 90-3 at 14–15.

---

[3] FCM Davis denies making this statement, but the Court recites the facts in the light most favorable to the Moores.  *See* dkt. 86 at 14 (citing dkt. 82-5 at 139–40).

4

The wellness check lasted about thirty minutes.  Dkt. 82-1 at 88.  FCM Davis was in the Moores' home for about twenty minutes.  *Id.*  During the visit, FCM Davis "searched the house" and observed the children.  *Id.* at 78, 88.  She did not attempt to remove the children from the home during or after the visit. *Id.* at 88.

### C. Procedural history

The Moores brought constitutional claims under 42 U.S.C. § 1983 against FCM Davis, Supervisor Bellamy, Henry County DCS Defendants FCM Leigh Anne Gebele and Supervisor David Balmer (collectively "State Defendants"), and GAL Miller.  Dkt. 27.  The Moores alleged that the Defendants violated their Fourth Amendment rights and Fourteenth Amendment due process rights.  The Court dismissed the claims against GAL Miller.  Dkt. 51.  The Moores also voluntarily dismissed their Fourth Amendment claims.  Dkt. 65.

The only claim remaining is the Moores' Fourteenth Amendment due process claim against the State Defendants, who now move for summary judgment.  Dkt. 85.

## II.
## Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must inform the Court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor."  *Zerante*, 555 F.3d at 584 (citation omitted).

### III.
### Analysis

In their summary judgment briefing, the Moores abandoned their due process claims against FCM Gebele and Supervisor Balmer.  Dkt. 91 at 1, 26–27.  State Defendants' motion for summary judgment as to FCM Gebele and Supervisor Balmer is therefore **GRANTED**.

The only remaining claim is the Moores' Fourteenth Amendment substantive due process familial integrity claim against FCM Davis and Supervisor Bellamy.[4]  FCM Davis and Supervisor Bellamy argue that they are entitled to summary judgment on the Moores' claim based on qualified immunity.  Dkts. 86, 92.

### A. Qualified immunity standard

"[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights

---

[4] Neither side addresses any Fourteenth Amendment procedural due process claim in their summary judgment briefs.  Dkts. 86, 91, 92.  To the extent the Moores maintain a procedural due process claim against FCM Davis and Supervisor Bellamy, the Court finds they have abandoned that claim.  *See Palmer v. Marion County*, 327 F.3d 588, 597–98 (7th Cir. 2003).

of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). This "clearly established" standard ensures "that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 646 (1987)). Qualified immunity thus "balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. The "difficult part" of the qualified-immunity test is "identifying the level of generality at which the constitutional right must be clearly established." *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). A "high level of generality" is not appropriate; instead, the question is "whether the law was clear in relation to the specific facts confronting the public official when he acted." *Id.*

**B. Clearly established law**

To meet their burden of showing that a constitutional right is "clearly established," the Moores must "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Leiser*, 933 F.3d at 701. FCM Davis and Supervisor Bellamy are therefore entitled to qualified immunity unless precedent "squarely governs"

7

the case at hand. *Mullenix*, 577 U.S. at 13 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004)). The Court assesses qualified immunity "in light of all relevant precedent," regardless of whether it was cited by the plaintiff. *Taylor v. Schwarzhuber*, 132 F.4th 480, 487 (7th Cir. 2025).

The Moores allege FCM Davis and Supervisor Bellamy violated their Fourteenth Amendment substantive due process right to familial integrity by conducting the December 3 wellness check after the adoption petitions had been granted. The Moores bear the burden of showing "that a reasonable [DCS caseworker] would or should know that her conduct is unlawful." *Sebesta v. Davis*, 878 F.3d 226, 234 (7th Cir. 2017).

The Fourteenth Amendment protects the "right to freedom from undue state interference with family relations." *Id.* at 232. "This includes the parents' right 'to bear and raise their children' and the child's right 'to be raised and nurtured by his parents.'" *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011) (quoting *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 928 (7th Cir. 2011)). "The constitutional right to familial integrity is not absolute; rather, it must be balanced against the state's interest in protecting children from abuse." *Siliven*, 635 F.3d at 928. To achieve that balance, "caseworkers must have 'some definite and articulable evidence giving rise to a reasonable suspicion' of past or imminent danger of abuse before they may take a child into protective custody." *Hernandez*, 657 F.3d at 478 (quoting *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir. 2000)); *see also Sebesta*, 878 F.3d at 235 ("[T]he state actors needed evidence supporting a

8

*reasonable* suspicion of abuse or neglect in order to report, investigate, and 'indicate' [plaintiff]."). "This 'reasonable suspicion' standard is an objective one," *Sebesta*, 878 F.3d at 233, that requires "more than a hunch but less than probable cause," *Siliven*, 635 F.3d at 928 (internal quotations omitted).

The following facts are undisputed as to what FCM Davis and Supervisor Bellamy knew when they initiated the December 3 wellness check at about 3:30 p.m.:

- The Hamilton County adoption petition giving the Moores custody of J.S.M. and J.D.M. had been granted the day before.

- The Moores took custody of the children by 10:00 a.m. on December 3.

- The Marion County CHINS case was still open and pending at that time.

- FCM Davis was the ongoing permanency caseworker assigned to that CHINS case.

- The Defendants had received a report after the Moores took custody but before initiating the wellness check that one of the children was sick and had a strong negative reaction when the Moores took custody, kicking and screaming while being placed into the Moores' vehicle.

Additionally, the parties dispute whether FCM Davis and the sheriff's deputy threatened to remove the children from the Moores' home if they did not allow the wellness check, but the Court assumes for the sake of this analysis that these threats were made.

The question here is whether a reasonable DCS caseworker would have known that it was clearly unlawful to conduct a wellness check under these circumstances. *See Sebesta*, 878 F.3d at 235; *Hernandez*, 657 F.3d at 475.

9

### 1. Pending CHINS case

The first issue is whether a reasonable DCS caseworker would have known that even though the CHINS case was still open, they no longer had the obligation or authority to investigate the wellbeing of the adopted minors because the adoption petition had been granted.

The Seventh Circuit recently explained the process for closing a CHINS case:

> CHINS cases remain open until "the objectives of the [CHINS] dispositional decree have been met," Ind. Code § 31-34-21-11, which can mean several things, such as reunification or termination of parental rights and adoption, among others.  If reunification is not a viable option, the State may initiate a termination of parental rights (TPR) proceeding. *See, e.g.*, Ind. Code §§ 31-34-21-7.5, 31-35-2-1.  The CHINS case continues until the child achieves permanency, which often does not occur until after the TPR proceeding (including any appeals) concludes. *See* Ind. Code §§ 31-19-11-6; 31-34-21-11.

*Ashley W. v. Holcomb*, 34 F.4th 588, 591 (7th Cir. 2022) (quoting State of Indiana's brief from *Nicole K. v. Stigdon*, 990 F.3d 534, 536–37 (7th Cir. 2021)).  Here, neither party designates evidence to explain what the CHINS dispositional decree's objectives were.  But drawing all reasonable inferences in the Moores' favor at this stage, the Court assumes that adoption of the children was the decree's objective.  Given that assumption, by the time FCM Davis and Supervisor Bellamy sought to initiate the December 3 wellness check, the dispositional decree's objective—the children's adoption—had already been met.

FCM Davis and Supervisor Bellamy argue that FCM Davis believed the pending Marion County CHINS case obligated and authorized her to investigate

J.S.M. and J.D.M.'s wellbeing after the adoption petitions had been granted. Dkt. 86 at 27. The Moores argue that "the CHINS action does not give Defendants the constitutional authority to interfere with the new adoptive family's relations" because, under Indiana law, the CHINS court was required to dismiss its case once the children were adopted. Dkt. 91 at 15–16. The Moores contend that under the legal framework for CHINS proceedings, it was clear that J.S.M. and J.D.M. no longer met the statutory standard for CHINS once the adoption petition was granted. *Id.* at 16. The Moores argue that this is self-evident—the CHINS proceeding was opened based on danger presented to J.S.M. and J.D.M. by their biological parents, not the Moores, so the danger to J.S.M. and J.D.M. disappeared when the adoption petition was granted. *Id.*

The Moores cite *In re Infant Girl W.*, 845 N.E.2d 229, 245–46 (Ind. Ct. App. 2006), as support for that proposition. In that case, the Indiana Court of Appeals interpreted Indiana Code § 31-34-21-11, which states that "[w]hen the [CHINS] juvenile court finds that the objectives of the dispositional decree have been met, the court shall discharge the child and the child's parent/guardian or custodian." *Id.* at 245. There, the probate court had granted the parents' adoption petition of a child for whom the dispositional goal was adoption, but five days later, the juvenile court denied the parents' motion to dismiss the open CHINS case. *Id.* at 236–37. At the time the parents filed their motion to dismiss the CHINS action, the goal of the child's dispositional decree had been met because the child had already been adopted. *Id.* at 245. Also, the court reasoned that the child no longer met the statutory standard for a CHINS

11

"inasmuch as there is universal agreement that [the child] has been well cared for by the Parents since she was two days old." *Id.* The court concluded that "[u]nder these circumstances, the Juvenile Court was statutorily required to dismiss the CHINS case." *Id.*

The Moores also designate evidence from which a reasonable jury could conclude FCM Davis and Supervisor Bellamy expected the CHINS case to be dismissed since the adoption petition had been granted. FCM Davis testified that she expected the CHINS case to be dismissed and agreed that if the CHINS case had been dismissed, she would not have had the authority to conduct the December 3 wellness check. Dkt. 90-1 at 73. And Supervisor Bellamy testified that she had never seen a case where a CHINS juvenile court did not close an open CHINS case after an adoption petition was granted. Dkt. 90-2 at 22.

However, the Moores' case law and designated evidence do not address the timing question presented—whether a DCS caseworker still has the obligation and authority to demand a wellness check after an adoption petition has been granted but before the CHINS case has been dismissed. *In re Infant Girl W.* stands only for the proposition that a CHINS court does not have discretion to deny a motion to dismiss an open CHINS case once an adoption is granted. It says nothing about what DCS caseworkers can or cannot do before a motion to dismiss the CHINS case is filed. Here, there's no designated evidence suggesting that a motion to dismiss the CHINS case had been filed on December 3. On the contrary, the CHINS case wasn't closed until December 26, 2021. Dkt. 51 at 15 (citing *C.M.*, 202 N.E.3d at 446). So, the DCS

12

caseworkers' legal obligations and authority where an adoption petition has been granted but a CHINS case involving the same children remains open is, at minimum, not obvious.

Indeed, testimony from FCM Davis and Supervisor Bellamy taken in the light most favorable to the Moores shows only that the caseworkers believed that the CHINS case would be dismissed at some undefined point in the future. The Moores do not cite any case that would have clearly put FCM Davis and Supervisor Bellamy on notice that the grant of the adoption petition immediately terminates the CHINS case, along with DCS's legal authority to act in response to a reasonable suspicion of past or imminent abuse.  *See Doe v. Heck*, 327 F.3d 492, 528 (7th Cir. 2003) (upholding qualified immunity where caseworkers relied on state statute that was determined to be unconstitutional as applied to the plaintiff but the statute's constitutionality had never been challenged prior to that case and there was "no reported decision (state or federal) addressing the precise issues" before the court).  So, there's no case clearly establishing that a court's grant of an adoption petition immediately extinguishes DCS's obligations and authority to investigate the wellbeing of children with a pending CHINS case.

The Moores, who bear the burden of showing "that a reasonable [DCS caseworker] would or should know that her conduct is unlawful," *Sebesta*, 878 F.3d at 234, therefore have not shown that under the circumstances presented here, a reasonable DCS caseworker would or should know that it would clearly

13

be unlawful to demand a wellness check after the adoption petition was granted.

### 2. Reasonable suspicion of abuse

That raises the second part of the inquiry: whether a reasonable DCS caseworker would or should have known that there clearly was not reasonable suspicion that the children had been abused or were in imminent danger of abuse.[5] *See Hernandez*, 657 F.3d at 478; *Sebesta*, 878 F.3d at 235. FCM Davis and Supervisor Bellamy argue that the information they possessed constituted reasonable suspicion justifying the December 3 wellness check. Dkt. 92 at 5. They also argue that "it would have been wholly irresponsible for the Defendants to have ignored the concerns raised on December 3" given Indiana's statutory requirement that DCS "shall initiate an appropriately thorough child protection assessment of every report of known or suspected child abuse or neglect the department receives." Dkt. 86 at 31–32; dkt. 92 at 6. And they contend "the chaotic and ongoing nature of the situation that was unfolding on December 3" provides further justification for the December 3 wellness check. Dkt. 86 at 27–28; dkt. 92 at 5.

The Moores, who bear the burden of showing "that a reasonable [DCS caseworker] would or should know that her conduct is unlawful," *Sebesta*, 878 F.3d at 234, argue that FCM Davis and Supervisor Bellamy initiated the December 3 wellness check arbitrarily because they did not have a reasonable

---

[5] For the sake of this analysis, the Court assumes without deciding that Supervisor Bellamy was personally involved in the alleged constitutional violation.

suspicion that the children had been abused or were in imminent danger of abuse.  Dkt. 91 at 14–19.  The Moores argue that the justifications for the wellness check offered by DCS were pretext and that FCM Davis's true motivation for the check was her belief that the unsubstantiated allegations against the Moores were true.  *Id.* at 25–26.

The reasonable suspicion standard, however, is objective, *Sebesta*, 878 F.3d at 233, so FCM Davis's true motivation for the visit doesn't carry any weight.  What matters for the qualified immunity inquiry is whether a reasonable DCS caseworker in FCM Davis and Supervisor Bellamy's position would or should have known under clearly established law and considering the information they possessed at the time that they clearly did not have reasonable suspicion to conduct the December 3 wellness check.  *See Hernandez*, 657 F.3d at 475; *Sebesta*, 878 F.3d at 235.

The parties dispute whether the Moores' removal of the children from the foster placement on the morning of December 3 could be fairly characterized as "forcible."  But the undisputed designated evidence shows that one of the children had a strong negative reaction to learning about the adoption and was kicking and screaming while being placed in the car to go with the Moores and leave the foster family.  Dkt. 82-5 at 118–20, 124–25.  The Moores do not cite any cases that would have put FCM Davis and Supervisor Bellamy on notice that initiating a wellness check under those circumstances would have violated the Moores' constitutional rights.  Accordingly, based on the entirety of the circumstances presented, a reasonable DCS investigator could have believed

15

reasonable suspicion existed to initiate the December 3 wellness check.  In other words, it would not have been clear to a reasonable DCS caseworker that conducting a wellness check under these circumstances was unlawful.

This conclusion is bolstered by the limited nature of the intervention that Defendants sought to conduct—a brief look around the inside of the home to assess whether J.S.M. and J.D.M. were safe—rather than taking the children into protective custody and removing them from their adoptive parents.  *See Siliven*, 635 F.3d at 928 (holding that removal of child to grandmother's house was justified by reasonable suspicion, even though it was "far from clear" that "the state's interest would have justified a greater intrusion on the [plaintiffs'] right to familial integrity"); *Sebesta*, 878 F.3d at 235 (noting as important that plaintiff "never lost custody of her daughter" and that the intact family services she received "interfered only minimally with her family structure").  The Seventh Circuit recently stated that it "doubt[ed] very much" that a child services welfare check "amounted to interference with family integrity" at all. *Gilbank v. Wood Cnty. Dep't of Hum. Servs.*, 111 F.4th 754, 788 (7th Cir. 2024) (en banc) (discussing welfare check based on anonymous tip that plaintiff and her child were living in a "garage during hot summer weather").

Here, the December 3 wellness check lasted about thirty minutes, and FCM Davis was in the Moores' home for about twenty minutes.  Dkt. 82-1 at 88.  During the visit, FCM Davis "searched the house" and observed the children, but she did not attempt to remove the children from the home during or after the visit.  *Id.* at 78, 88.  This short wellness check was far less intrusive

16

than the child's removal to a relative's house in *Siliven* or the six months of intact family services in *Sebesta*.  Instead, the December 3 check was more akin to the welfare check in *Gilbank*, which the en banc Seventh Circuit doubted amounted to interference with familial integrity.  Given the need to balance the constitutional right to familial integrity against the state's interest in protecting children from abuse, *Siliven*, 635 F.3d at 928, it's not clear that the December 3 wellness check interfered with the Moores' post-adoption familial integrity, *see Gilbank*, 111 F.4th at 788.  But even if it did, any such "intrusion on the [Moores'] constitutional right to familial integrity was no greater than necessary to address" the facts confronted by FCM Davis and Supervisor Bellamy.  *Siliven*, 635 F.3d at 928–29.

The Moores also argue that they did not consent to the December 3 wellness check because FCM Davis and the Henry County sheriff's deputy threatened to remove the children from the home if the Moores did not allow the wellness check to proceed, and the coercive nature of the threat did not dissipate when the parties' lawyers conferred before the wellness check.  Dkt. 91 at 19–22.  FCM Davis disputes making this threat.  *See* dkt. 86 at 14 (citing dkt. 82-5 at 139–40).  However, even if those threats were made, FCM Davis and Supervisor Bellamy didn't need to rely on the Moores' consent as justification for the December 3 wellness check.  That's because, as established above, a reasonable DCS caseworker could have believed she had reasonable suspicion to justify the check.

17

The Moores also argue that FCM Davis and the sheriff's deputy did not have legal authority to make these threats, which undermines the legality of the December 3 wellness check.[6]  Dkt. 91 at 21.  The Seventh Circuit has drawn a distinction between "lawful threats" and "threats not grounded in proper legal authority."  *Hernandez*, 657 F.3d at 482.  Only the latter pose constitutional issues.  *Id.*  In contrast, it does not constitute impermissible duress for a caseworker to make a threat that's supported by proper legal authority.  *Id.*  And "in the context of protecting a child from his parents, 'proper legal authority' means 'some definite and articulable evidence giving rise to a reasonable suspicion' of past or imminent danger of abuse."  *Id.* (quoting *Brokaw*, 235 F.3d at 1019).  So here, since a DCS caseworker could have reasonably suspected abuse, it follows that threatening to remove J.S.M. and J.D.M. if the Moores did not allow FCM Davis to enter the home and conduct the wellness check did not undermine the wellness check's legality. *See Dupuy v. Samuels*, 465 F.3d 757, 762 (7th Cir. 2006) ("It is not a forbidden means of 'coercing' a settlement to threaten merely to enforce one's legal rights.").

In sum, there was no case so "closely analogous" as to put FCM Davis and Supervisor Bellamy on notice that conducting the wellness check on December 3 would violate the Moores' constitutional rights.  *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018).  Nor were there cases evincing "such a clear

---

[6] The Moores do not argue that any threats made by FCM Davis or the Henry County sheriff's deputy, on their own, violated the Moores' right to familial integrity.

18

trend . . . that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Id.*

Finally, the Moores appear to argue that FCM Davis and Supervisor Bellamy's conduct was "so egregious and unreasonable that no reasonable official could have thought [she] was acting lawfully." *Id.* "Officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). In "rare cases," a plaintiff can demonstrate a right is clearly established without pointing to controlling authority by showing an officer's conduct was "so egregious and unreasonable that *no reasonable official* could have thought he was acting lawfully." *Reed*, 906 F.3d at 546 (emphasis supplied).

The Moores contend that this is one of those rare cases. It's not. FCM Davis and Supervisor Bellamy were "called upon to make difficult decisions without the benefit of extended deliberation." *Heck*, 327 F.3d at 525. Confronted by such a decision, they chose to act on the information they learned earlier that day with a measured, proportionate response—a wellness check. The Moores have not established that no reasonable DCS caseworker could have chosen the same course of action as FCM Davis and Supervisor Bellamy.

In conclusion, the Moores have not overcome FCM Davis and Supervisor Bellamy's assertion of qualified immunity because they have not shown that they had a clearly established right under the Fourteenth Amendment to have DCS not conduct a wellness check on J.S.M. and J.D.M. after the adoption

19

petition was granted and the CHINS case was still open.  FCM Davis and

Supervisor Bellamy are entitled to summary judgment.

## IV.
## Conclusion

State Defendants' motion for summary judgment is **GRANTED**.  Dkt.

[85].  Final judgment shall issue by separate entry.

**SO ORDERED.**

Date: 7/11/2025

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel